**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward ALLISON, Jr., Defendant–**
**Appellant.**

**No. 95–10289.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 13, 1996.

Decided June 24, 1996.

---

Lawrence L. Tong and Leslie E. Osborne, Assistant United States Attorneys, Honolulu, Hawaii, for plaintiff-appellee.

Pamela J. Berman Byrne, Assistant Federal Public Defender, Honolulu, Hawaii, for defendant-appellant.

Before: HALL and BRUNETTI, Circuit Judges, and WEINER,* District Judge.

BRUNETTI, Circuit Judge:

Edward Allison, Jr. pled guilty to conspiracy to defraud or use one or more unauthorized access devices to obtain goods and services having a value of more than $1,000, in violation of 18 U.S.C. § 1029(b)(2). Allison appeals his sentence.[1] We have jurisdiction over this timely appeal. 18 U.S.C. § 3742(a), 28 U.S.C. § 1291. We vacate the sentence and remand for resentencing.

## I. BACKGROUND

On December 15, 1994, a five-count Indictment was filed against appellant Edward Allison, Jr. and his co-defendant Maura T. Peralta. Count one alleged that the defendants conspired to defraud or use one or more unauthorized access devices to obtain goods and services having a value of more than $1,000, in violation of 18 U.S.C. § 1029(b)(2). Counts two through five charged the defendants with knowingly using an unauthorized access device to obtain goods and services having value of more than $1,000, in violation of 18 U.S.C. § 1029(a)(2).

Peralta was employed as a loan processor at the Bank of Hawaii Bank Card Center ("Bank of Hawaii"). She used the computer to create credit card accounts that were not supported by any applications, and caused credit cards to be issued to Allison and Peralta. A total of five credit cards were issued in this manner, but only four were identified in the indictment.[2] Allison and Peralta used the cards to obtain goods, services, and cash

---

* Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Allison's co-defendant, Maura T. Peralta, did not file objections to the Presentence Report ("PSR") and did not file an appeal.

2. The district court calculated the amount of loss without including the amount of loss caused by the fifth card because it was not established by a preponderance of the evidence.

advances. They made a total of $40,208.35 in charges, incurred interest and fees of $1,601.69, and paid $5,357.28 to Bank of Hawaii.

On February 24, 1995, Allison pled guilty to count one, the conspiracy count. In the plea agreement, Allison and the government agreed that the actual and intended losses attributable to the conspiracy were more than $20,000, but less than $40,000. The plea agreement, however, provided that the district court was not bound by any stipulation entered into by the parties, but could, with the aid of the Presentence Report ("PSR"), determine the facts relevant to sentencing.

In the PSR and its addenda, the Probation Office determined that the loss to the Bank of Hawaii was $40,208.35, not including interest and fees, because this amount represented the value of the money, property, or services taken. Allison objected to the calculation of the amount of loss in the PSR, contending that the amount of loss should have been the actual amount of loss (deducting the pre-indictment payments to the credit card accounts from the amount charged on the credit cards). The Probation Office reasoned that this case was different from the case law cited by Allison because it did not involve a fraudulent loan application. The Probation Office concluded that the credit cards were in effect stolen from the Bank of Hawaii and the correct "loss" amount was the total amount of unauthorized charges. The district court adopted the position of the Probation Office.

## II. ANALYSIS

■ The district court's interpretation and application of the Sentencing Guidelines are reviewed de novo. *United States v. Buenrostro–Torres*, 24 F.3d 1173, 1174 (9th Cir. 1994).

■ Allison was convicted of access device fraud. He claims that the district court erred in determining the amount of his victim's loss when it calculated his sentence. The issue presented in this case is whether, in a credit card fraud case, the amount paid by the defendant to the victim before indictment should be deducted from the amount of "loss" in calculating the sentence.

Appendix A of the Guidelines Manual specifies that the applicable Sentencing Guideline section to apply to a person convicted of violating 18 U.S.C. § 1029, is U.S.S.G. § 2F1.1. U.S.S.G.App. A. The parties do not dispute the applicability of U.S.S.G. § 2F1.1 to Allison's offense. Section 2F1.1 sets a base offense level of six with further increases in the level "[i]f the loss exceeded $2,000 . . . ." U.S.S.G. § 2F1.1(a) & (b)(1). Section 2F1.1(b)(1) provides a table that increases the offense level as the amount of the loss increases.

Application note 7 to U.S.S.G. § 2F1.1 states:

> Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

U.S.S.G. § 2F1.1, comment. (n. 7).

U.S.S.G. § 2B1.1 application note 2, which was cross-referenced by U.S.S.G. § 2F1.1 application note 7 describes the method of valuation:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. . . . When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.

U.S.S.G. § 2B1.1, comment. (n. 2). The valuation of what was taken from the victim is important because "it is an indicator of both the harm to the victim and the gain to the defendant." § 2B1.1, comment. (backg'd.).

U.S.S.G. § 2F1.1 does not always use the definition of loss provided by the theft guidelines. Application note 7 lists some instances where additional factors are to be considered in determining the loss or intended loss. U.S.S.G. § 2F1.1, comment. (nn. 7(a) through 7(e)). For example, in cases where "[a] fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless) ... the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received." U.S.S.G. § 2F1.1, comment. (n. 7(a)). Another example provided by the guidelines states:

> [i]n fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

U.S.S.G. § 2F1.1, comment. (n. 7(b)).

In the past, courts imposing sentences under U.S.S.G. § 2F1.1 have applied § 2B1.1's definition of "loss" unless the situation fit into one of § 2F1.1's express exceptions. *See United States v. Burns,* 894 F.2d 334, 336 (9th Cir.1990) (holding that the amount of loss should include sales tax and shipping costs on computer equipment bought by stolen credit card numbers).

■ Recently, this Circuit has refused to mechanically apply U.S.S.G. § 2B1.1 and has held that in calculating loss in fraud cases, the sentencing court should take a realistic,

economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss. *United States v. Harper,* 32 F.3d 1387, 1392 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1162, 130 L.Ed.2d 1118 (1995).

In *Harper,* the defendant was convicted of mail fraud, equity skimming, and conspiracy to commit mail fraud and equity skimming. *Id.* at 1388. Harper tricked homeowners who were behind on their mortgage payments into believing that if they sold their homes to him, they would no longer be obligated on their mortgages and their credit histories would not show that they had been foreclosed upon. *Id.* at 1389. In fact, Harper rented the houses and then allowed the lenders to foreclose the properties. *Id.* at 1388. In calculating Harper's sentence, the district court calculated the loss as the total amount of rent collected *and* the average fair market value of the unencumbered properties. We reversed, reasoning that Harper did not set out to take the fair market value of the homes away from the victims, and that actual loss was the realistic and economic approach to determine "loss" *Id.* at 1392. We explicitly stated that "we ... insist upon [the] use of a realistic, economic approach to determining what losses [the defendant] truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss." *Id.* In so doing, we rejected the proposition that U.S.S.G. § 2B1.1's definition of "loss" applied to all fraud cases except those falling within the exceptions enumerated in Note 7.

We follow the reasoning of *Harper.*[3] *Harper*'s rule does not conflict with the language of U.S.S.G. § 2F1.1. U.S.S.G. § 2F1.1 notes that although loss in a fraud case frequently will be the same as in a theft case, there are exceptions. U.S.S.G. § 2F1.1, comment. (n. 7). Nowhere does the comment state that the exceptions listed in Note 7 are exclusive.

*Harper* is especially appropriate for this case because Allison was charged with fraud

---

3. *Harper* follows a well-reasoned decision by the Third Circuit. *See United States v. Kopp,* 951 F.2d 521, 529 (3d Cir.1991) (stating that "Mechanical application of the theft guideline [U.S.S.G. § 2B1.1] in fraud cases would frustrate the legislative purpose of the guidelines and con-

and sentenced for fraud, not theft.[4] Applying the economic reality approach to this case, the Bank of Hawaii's actual loss is the outstanding credit card balance prior to the discovery of the offense, not the total amount charged on the four credit cards. This amount reflects the amount of loss more realistically than the amount of money taken.

At the sentencing hearing, the district court analogized this case to *United States v. Sowels,* 998 F.2d 249 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994). Sowels was a postal employee who stole 110 credit cards from the mail, but was apprehended before he could use them. *Id.* at 250. He was charged with and convicted of theft. During sentencing, the court found the "loss" to be the sum total of the credit card limits of the stolen cards, even though Sowels had not used the cards at all. We find *Sowels* distinguishable because Sowels, unlike Allison, was charged with a *theft* offense, for which the method of calculation used by the *Sowels* court is appropriate.

The government argues that even if Allison is correct that the amount of loss was the balance of the credit card accounts prior to indictment, the district court imposed a permissible sentence under the guideline range for an offense level of ten and criminal history category of I, 6–12 months. The district court stated: "even if I were to adopt [Allison's] position, the question of whether or not Mr. Allison is incarcerated is a separate question. And we still have the ability to incarcerate him even if we had adopted [his] reasoning." Regardless of what the district court would have done, we find that it miscalculated Allison's offense level.

■ Allison contends that if his offense level were reduced by one level, he would not be required to serve jail time. We interpret Allison's argument to mean that if his offense

level were ten, he could serve his jail time in community confinement or home detention, as opposed to in jail.[5] *See* U.S.S.G. § 5B1.1(a)(2); U.S.S.G. § 5C1.1(c). The issue as to how Allison is to serve his jail time is for the district court to determine on remand.

The sentence is vacated and this case is remanded for resentencing in accordance with this opinion.

SENTENCE VACATED; REMANDED FOR RESENTENCING.

---

travene the specific language of the Commission.").

**4.** The probation officer stated that because Peralta created these credit cards while working as a loan processor, she essentially stole the credit cards. Presumably, the probation officer meant that because Peralta did not make a false application to obtain the credit cards, she stole the credit cards. This argument is not persuasive. Peralta obtained these credit cards through fraud by inputting false information into Bank of Hawaii's computer system. The fact that there were no supporting applications for the credit

cards does not convert this fraud to a theft. 18 U.S.C. § 1029(a)(2) only requires the use of an unauthorized access device (in this case, a credit card) to obtain anything of value aggregating $1,000 or more during a one-year period. 18 U.S.C. § 1029(a)(2).

**5.** The district court imposed a sentence of four months imprisonment to be followed by four months of either home detention or community confinement.

